*571 TEXTO COMPLETO DE LA RESOLUCION
La recurrente, Walgreens of Puerto Rico, Inc. (Walgreens), nos presentó un recurso de revisión impugnando la resolución emitida por la Secretaria de Salud en la cual denegó el certificado de necesidad y conveniencia solicitado por Walgreens. Señala la recurrente que incidió la Secretaria de Salud en sus determinaciones de hechos y conclusiones de derecho.
Examinada la petición de revisión, procedemos a denegar la expedición del auto solicitado.
El 17 de abril de 1998, Walgreens presentó ante el Departamento de Salud (Departamento) una Solicitud de Certificado de Necesidad y Conveniencia para relocalizar su recetario, ubicado en la Avenida Piñeiro Núm. 1198, esquina Calle 15, en Puerto Nuevo, al establecimiento operado por Walgreens en el Centro Comercial Reparto Metropolitano, el cual no contaba con servicios de recetario.
El 11 de junio de 1999, luego de haberse completado el descubrimiento de prueba, la parte proponente, Walgreens, y las opositoras, Farmacia Don Gelpí, Farmacia Don Bosco, Farmacia Vargas, Farmacia Reyes y Farmacia Metropol, sometieron una Acta Enmendada de Conferencia con Antelación a Vista para que rigiera los procedimientos en la vista. En ésta, las partes sometieron cuarenta y seis (46) estipulaciones de hechos, las primeras veintidós (22) nos proveen un recuento del historial procesal del caso y de los hechos principales pertinentes a la controversia de autos. A continuación, reproducimos las mismas

“1. Desde 1991, Walgreens opera un establecimiento en el Centro Comercial Reparto Metropolitano que no tiene recetario, pero cuenta con un extenso inventario de medicamentos que se venden sin receta conocidos como "over the counter drugs", así como otros productos característicos de las farmacias y/o que generalmente se venden en las farmacias.

2. El 21 de marzo de 1991, el Departamento expidió administrativamente a Walgreens el CNC #91-048 
*572
autorizándole a adquirir la Farmacia Americo Miranda, y relocalizarla al Centro Comercial Reparto Metropolitano.

3 En junio de 1991, Walgreens comenzó a operar un recetario en el Centro Comercial Reparto Metropolitano. Dicho recetario fue cerrado el 2 de septiembre de 1992.

4. Walgreens operó el recetario en su establecimiento en el Centro Comercial Reparto Metropolitano durante un período de quince (15) meses, aproximadamente.

5. Mediante sentencia dictada por el Tribunal Superior el 12 de noviembre de 1991, KAC 91-919 (906), se revocó el CNC otorgado por el Departamento a Walgreens por no haberse celebrado previamente una vista administrativa.

6. Luego de celebrarse vistas administrativas el 20 de noviembre de 1992, 24 de febrero de 1993 y 9 de marzo de 1993 (procedimiento 89-01-306), el Hon. Secretario de Salud, Enrique Vázquez Quintana, M.D., emitió una resolución el 1 de septiembre de 1993, denegando la solicitud de CNC de Walgreens.

7. El 30 de junio de 1995, el Departamento le otorgó administrativamente a Walgreens el CNC núm. 95-17 para adquirir la Farmacia Norma en la Avenida Piñeiro y continuar operando allí una farmacia bajo el nombre de Farmacia Walgreens.

8. La Farmacia Walgreens opera en la Avenida Piñeiro desde agosto de 1995.

9. Como parte del programa de reforma de los servicios de salud en Puerto Rico, el 7 de septiembre de 1993 se aprobó la Ley Núm. 72 que creó la Administración de Seguros de Salud de Puerto Rico ("ASES"), corporación pública encomendada de implantar, administrar y negociar con aseguradores de seguros de salud. Esta ley requiere que la cubierta de los seguros de salud provea, entre otros beneficios mínimos, "medicamentos mediante prescripción médica, los cuales deberán ser despachados en una farmacia participante libremente seleccionada por el asegurado y autorizada bajo las leyes de Puerto Rico". Véase, 24 L.P.R.A. see. 7032.

10. Walgreens es "proveedor participante", bajo la ley de ASES. Usuarios de la Tarjeta de Salud pueden comprar medicamentos en cualquier Farmacia Walgreens, aun en aquellas localizadas en areas donde todavía no se ha implantado la Reforma, incluyendo la Farmacia Walgreens ubicada en la Avenida Piñeiro.

11. La distancia existente entre la Farmacia Walgreens en la Avenida Piñeiro y el establecimiento Walgreens en el Centro Comercial Reparto Metropolitano es de 979.97 metros (0.60 millas); es decir, menos de una milla.

12. El establecimiento Walgreens en el Centro Comercial Reparto Metropolitano consiste de un área total de 16,756 pies cuadrados. El área total consta de dos niveles. El primer nivel, donde está el área de ventas, consiste de 11,000 pies cuadrados, aproximadamente. El segundo nivel, donde está el área de almacén, consiste de 5,000 pies cuadrados, aproximadamente. La farmacia que Walgreens propone reubicar a su facilidad en el Centro Comercial Reparto Metropolitano ocuparía un área total de 917 pies cuadrados, incluyendo dos ventanillas para atender a la clientela y una sala de espera.

13. El Centro Comercial Reparto Metropolitano comprende un área total de construcción de 122,913 pies cuadrados en un predio de 3.78 cuerdas. Conforme los criterios establecidos por el Departamento de Comercio de Puerto Rico, dicho Centro corresponde a la categoría de centros comerciales subregionales.

14. El Centro Comercial Reparto Metropolitano cuenta con 300 espacios de estacionamientos disponibles para los visitantes al centro comercial.

*573
15. El horario de operaciones de la Farmacia Walgreens en la Avenida Piñeiro es de 8:00 A.M. a 8:00 P. M. de lunes a sábado y de 11:00 AM. a 5:00 P.M. los domingos. El horario de la Farmacia Walgreens en la nueva ubicación propuesta en el Centro Comercial Reparto Metropolitano sería de 8:00 a.m. a 10:00 p.m. de lunes a domingo.

16. El recetario de la Farmacia Walgreens en la Avenida Piñeiro tiene un área de 382 pies cuadrados, aproximadamente.

17. La Farmacia Walgreens en la Avenida Piñeiro cuenta con cinco (5) espacios de estacionamiento para su clientela.

18. Conforme al Censo de Población de 1990, el numero de residentes en el área de servicio de la localización propuesta para la Farmacia Walgreens en el Centro Comercial Reparto Metropolitano alcanzó 38,665. ;

19. Actualmente existen dieciocho (18) farmacias en el radio de una milla de la localización actual de la Farmacia Walgreens en la Avenida Piñeiro, a saber: Farmacia Walgreens, Farmacia Pharma Home, Professional Drug, Farmacia San Patricio, Farmacia Reyes I, Farmacia Gelpí, Farmacia Don Bosco, Farmacia Central Drug, Farmacia Vargas, Farmacia Reymundí, Farmacia Ibarra, Farmacia San Femando, Farmacia Chelimar, Farmacia La Nueva Casta, Farmacia Borinquen Towers, Farmacia Caparra Heights, Farmacia Las Lomas y Farmacia González.

20. Conforme al Censo de Población de 1990, el número de residentes en el área de servicio de la Farmacia Walgreens en la Avenida Piñeiro alcanzo 41,348. De una comparación del área de servicio de la Farmacia Walgreens en la Avenida Piñeiro y el área de servicio de la localización propuesta, se desprende que 27,011 délos residentes dentro de la milla de la localización actual de Walgreen,s según el Censo de 1990 (lo que constituye un 65.3% de los residentes en el área de servicio de la localización actual de la Farmacia Walgreens en la Avenida Piñeiro), continuarían residiendo dentro de la milla de la nueva localización.

21. Actualmente existen diecisiete (17) farmacias dentro del radio de una milla del establecimiento Walgreens ubicado en el Centro Comercial Reparto Metropolitano; a saber, Farmacia Gelpí, Farmacia Don Bosco, Walgreens Expreso, Farmacia San Patricio, Farmacia Reyes, Farmacia González, Farmacia Hospital del Maestro, Farmacia Domenech, Farmacia Profesional Drug, Farmacia Central Drug, Farmacia Reymundí, Farmacia Ibarra, Farmacia Vargas, Farmacia University Gardens, Farmacia Pharma Home, Farmacia Él Amal #45 y Farmacia Metropol.

22. A base del cómputo del número de personas que residen en los distintos sectores censales comprendidos en el área de una milla circundantes a la Farmacia Walgreens en la Avenida Piñeiro (4L348, habitantes), y el número de farmacias existentes en dicha área (18), existe una proporción de 2,297 habitantes por farmacias en dicha área de servicio actual. En lo que respecta al área de una milla circundante a la localización propuesta en Reparto Metropolitano al dividirse el número de habitantes en esa área (38,665) entre el número de farmacias existentes en esa área (17), ello arroja una proporción de 2,274 habitantes por farmacia. ”

Además de las estipulaciones, la proponente presentó en evidencia veintiséis (26) documentos y otros exhibits y las opositoras presentaron cinco (5) exhibits.
La vista evidenciaría ante la Oficial Examinadora del Departamento de Salud se celebró el 15 y 16 de junio de 1999. La proponente y las opositoras presentaron varios testigos, incluyendo a un perito economista para sustentar sus respectivas posiciones. El testimonio de estos últimos fue resumido en el Informe de la Oficial Examinadora como sigue:
*574 “i.

11. El siguiente testimonio por la proponente lo fue su segundo perito, el Dr. Freyre. Inicialmente, dicho perito hizo referencia a su informe, sobre áreas que constan estipuladas como hechos en el Acta Enmendada de Conferencia con Antelación a Vista. Testificó sobre las características socioeconómicas del área, los niveles de ingresos y su opinión sobre el efecto que tendría la Reforma de Salud en el area cuando esta sea establecida en San Juan. También elaboró sobre su opinión de que las Opositoras no sufrieron como consecuencia del período de quince (15) meses entre el 1991 y el 1992, que la proponente operó un recetario en el local propuesto.

12. El perito proponente enfocó su testimonio en su análisis del Indice Herfindahl-Hirschman ("HHI"), y _r , i 'l:7. —I.«7 oposito J' s,"l.rr\i mT/^'/j/rt’ -fs,minv nrtm hnrpr vuhir í>] Tndir'p" stá en aproxin hipótesis se asuma, la presencia de la proponente . según él, es el nivel crítico y máximo permitido.

13. En contrainterrogatorio, aceptó haber incluido en sus cómputos del HHI a la Farmacia Siempre Abierta, una farmacia que está fuera del radio de la milla que define el area de servicio a ser evaluada en esta solicitud. Aceptó, además, que el excluir dicha farmacia en un análisis del HHI, hace que éste aumente. Resulta evidente que el incluir dicha farmacia en el análisis del perito proponente distorsiona sus conclusiones, ya que arroja un HHI menor al que realmente resultaría si es excluida. Aceptó que en su análisis inicial del HHI, le asignó a la proponente un despacho de recetas menor que el que ella experimentó cuando operó su recetario [en] el local propuesto por quince (15) meses entre el 1991 y el 1992, aceptando que el HHI subiría si se le asigna un mayor volumen de recetas despachadas por Walgreens. Aceptó, también, que en ningun[a] de sus evaluaciones del HHI contempló adjudicar mermas en el despacho de las demás farmacias del área, si se le permite a la proponente operar un recetario en el local propuesto. Finalmente aceptó, también, que al igual que hay muchas formas de subir un HHI, también hay muchas formas de bajarlo.

14.

15. El único testigo que testificó por las Opositoras durante la vista administrativa lo fue su perito, el Sr. Feliciano, quien enfatizó en su análisis del HHI y en refutar las opiniones del perito proponente. Comenzó declarando que el HHI es solamente un indicador para evaluar los posibles efectos que determinada transacción propuesta pudiese causar en la competencia y en la concentración de la prestación de servicios o productos en determinado mercado. Por ende, recalcó que es sumamente importante utilizar premisas razonables y consistentes en el cómputo del HHI, de manera que el resultado sea confiable.

16. Sobre el análisis y las conclusiones del perito proponente, el perito opositor indicó que son deficientes por tres (3) razones; a saber:

(1) Porque incluye en sus cómputos del HHI a la Farmacia Siempre Abierta, la cual no está dentro del radio de la milla que define el área de servicio evaluada;

(2) Porque le adjudica a la proponente un despacho de recetas menor en el local propuesto que aquél que, en efecto, despachó durante el período de quince (15) [meses] que operó un recetario en el local propuesto entre 1991 y 1992, en vez de considerar una cantidad igual a la experimentada durante aquel período, ajustada al aumento en despacho de recetas que ha ocurrido en el área de servicio durante los últimos años; y

(3) Porque en su análisis del HHIel perito proponente no contempla la realidad que la presencia de la proponente en el local propuesto causaría una merma en el despacho de las demás farmacias del área de servicio, lo que le daría a la proponente una presencia más significativa en el área de servicio, y, por ende, resultaría en un HHI mayor, indicando una concentración mayor.

*575
17. Enfatizando en la importancia de ser consistente, el perito opositor excluyó a la Farmacia Siempre Abierta de todos sus cómputos del HHI. Concluyó que por razón de esa deficiencia, no sólo las cifras ofrecidas por el perito proponente distorsionan la realidad, sino que el incluir a dicha farmacia hace que cualquiera de las conclusiones del perito proponente sean meras especulaciones sobre el verdadero HHI que resultaría.

18. Enfatizó, además, que el análisis del perito proponente está seriamente viciado porque la participación de la proponente en el area de servicio tiene que partir de la premisa que, de permitírsele ahora operar un recetario en el local propuesto; ésta despacharía un número mayor que lo que. despachó allí entre el 1991 y el 1992. Concluyo el perito opositor que el HHI no puede, bajo ningún concepto, basarse en cifras iguales o menores que lo que se sabe ocurrió hace mas de siete (7) años, ya que se sabe que desde entonces ha habido un incremento en el despacho de recetas en el área de servicio. A esos efectos, opina que las cifras del HHI ofrecidas por el perito proponente están desinfladas sobre lo que es probable que ocurra si se le concede a la proponente el CNC que solicita.

Finalmente, argumento que el análisis del perito proponente queda aún más viciado porque no contempla el impacto negativo que tendría la operación de la farmacia propuesta sobre las demás farmacias dentro del area de servicio. Para demostrar su punto, y como ejemplo, se apoyó en el hecho estipulado sobre las recetas que la Farmacia Gelpí despachó mensualmente durante los años 1991 y 1992, concluyendo que la presencia de la proponente en el local propuesto ocasionó en esa opositora un efecto negativo significativo durante el período de quince (15) meses entre julio de 1991 y septiembre de 1992.

20. El perito opositor indico que en la actualidad, el HHI esta en 958 (Tabla 1, excluyendo la Farmacia Siempre Abierta), lo cual refleja una saludable concentración en el área de servicio como está, el cual incluye la farmacia Walgreens RxExpress en su actual local. Sin embargo, contrario al perito proponente, concluyó que el HHI más probable de permitirse la relocalización solicitada aumentaría a 2,136, más del doble que en la actualidad (su Tabla 5-A.). Indicó que tan sustancial aumento en el HHI hace forzoso concluir que la presencia de la proponente en el local propuesto sería evidentemente inaceptable, por lo que opina que la solicitud de CNC de la proponente debe ser denegada. ”

El 28 de julio de 1999, la Oficial Examinadora emitió su Informe, recomendando que se denegara la solicitud de Walgreens. Esta expone, en parte, como sigue:
El Reglamento Núm. 89 sustituyó al anterior Reglamento Núm. 56 para permitirle a este Departamento hacer uso de su discreción y evaluar caso a caso cada solicitud en base a las fuerzas del mercado, evaluando niveles de competitividad y <¿c eficiencia operacional de las facilidades de salud existentes, el nivel de concentración existente en el área propuesta y la medida en que un incremento en la oferta estimule o disminuya la competencia. La aplicación de estos conceptos permite una mayor flexibilidad en la concesión de los CNC, maximizando la probabilidad de que se otorgue un buen servicio a la población de un área designada, ya que en vez de sujetar el permiso a criterios geográficos y poblacionales únicamente, contempla objetivos de competitividad, eficiencia operacional y calidad de servicio ofrecido. Resulta entonces que con el Reglamento Núm. 89, es la posición de este Departamento enfocar en el impacto de competitividad, en la eficiencia operacional y en la calidad del servicio ofrecido en determinada área, como elementos básicos al evaluar solicitudes de CNC. ”

En cuanto a la solicitud que nos ocupa, se toma conocimiento de que la- necesidad y conveniencia de permitir la operación de un recetario por la proponente en el local propuesto en el Centro Comercial Reparto Metropolitano ha sido objeto de extenso análisis anterior por este Departamento, en los procedimientos anteriores números 89-01-306 y A-95-01-071, en los cuales se denegó similar solicitud.

En el procedimiento 89-01-306, bajo el hoy derogado Reglamento Núm. 56, se concluyó que la presencia en el local propuesto de una farmacia de cadena como la proponente tendría un efecto sustancialmente negativo sobre las demás farmacias que allí operan, lo cual iría en detrimento de la ordenada prestación de 
*576
servicios de farmacia, a los residentes en esa area. Surge evidente que, al considerar el efecto adverso que le hubiese ocasionado a las Opositoras el concederle el CNC solicitado a la proponente en el 89-01-306, aquella decisión consideró aspectos de concentración y niveles de competencia similares a los que hoy se analizan bajo el Reglamento Núm. 89.

Iguales criterios fueron considerados en el procedimiento anterior número A-95-01-071, bajo el Reglamento Núm. 56, concluyéndose que era necesario y conveniente que la proponente continuara proveyendo servicios de farmacia precisamente en el local donde esta en la Avenida Pineiro, y que el permitirle la relocalización de su Farmacia Walgreens RxExpress, no sólo conllevaría el que se trastocase indebidamente la prestación de servicios de farmacia en el área del Reparto Metropolitano, sino que se afectase igualmente el área de servicio actual de la Farmacia Walgreens RxExpress.

Aquilatada la prueba presentada en esta solicitud, asi como los hechos y los testimonios estipulados por las partes en el Acta Enmendada de Conferencia con Antelación a Vista, la conclusión de este procedimiento tiene que ser la misma. Eso es así porque, no sólo se demostró que el área de servicio está bien servida por las farmacias existentes en el área de servicio propuesta, sino que las demas farmacias del area se venan severamente afectadas por la relocalización, a su vez afectando directamente la ordenada prestación de esos servicios a los residentes en el área. Aun cuando se adoptase la posición de la proponente, resulta evidente que el aumento en el HHI sería de todas formas significativo, y acceder a lo solicitado sería arriesgar el sano balance en la prestación de servicios de farmacia en el área de servicio que nos ocupa. ” (Enfasis suplido.)
Tal conclusión está fundamentada por la prueba recibida y es consistente con las resoluciones de los procedimientos anteriores que, como se ha indicado, indicaron su preocupación al impacto significativamente perjudicial que tendría la proponente de concederse lo solicitado.
El 29 de julio del 1999, la Secretaria de Salud emitió Resolución, en la cual acogió el Informe de la Oficial Examinadora, por ser sus conclusiones y análisis correctos, y denegó el CNC solicitado.
Inconforme con dicha determinación, Walgreens solicitó reconsideración, la que no fue acogida, luego de lo cual presentó el recurso de revisión que aquí nos concierne. En el mismo señaló que:

“1. La Resolución es arbitraria porque las conclusiones de la Oficial Examinadora no están sustentadas por prueba sustancial.

a. Erró el Departamento al sostener que como previamente denegó la solicitud de CNC presentada por la Farmacia Walgreens bajo el Reglamento 56 para relocalizar su farmacia de la Avenida Piñeiro a Reparto Metropolitano, su solicitud de CNC bajo el Reglamento 89 también debe ser denegada.

b. Contrario a lo determinado por el Departamento, tanto la realidad reflejada durante la operación de ■ una Farmacia Walgreens en Reparto Metropolitano por quince meses como el Indice Herfindhal [sic] Hirschman ("HHI"), demostraron que la relocalización propuesta por Walgreens no causará detrimento a las farmacias existentes.

c. La relocalización de la Farmacia Walgreens tampoco causará detrimento a la población.

d. Erró el Departamento al evaluar la solicitud de CNC de Walgreens a base del local que ocupa actualmente en lugar de basarse en el área de servicio en su totalidad.

e. Erró el Departamento al concluir tácitamente que es mejor que la Farmacia Walgreens cierre y abandone el área de servicio a que se relocalice a otra facilidad dentro de la misma area de servicio.

2. La Resolución es contraria a la actual política pública en tomo a la prestación de servicios de salud en 
*577
Puerto Rico. ”

II
La Ley Núm. 2 de 7 de noviembre de 1975, según enmendada, 24 L.P.R.A. sees. 334 a 334j, dispone sobre la concesión de certificados de necesidad y conveniencia para diversos tipos de facilidades de servicios de salud; entre otras, las farmacias. En su exposición de motivos, el legislador expresa: 

La planificación ordenada de las facilidades y servicios de salud es indispensable para atender adecuadamente las necesidades de salud de [la] población, controlar los costos de los servicios de salud y velar porque éstos se presten en aquellos núcleos poblacionales donde sean necesarios.

Para lograr estos objetivos es indispensable que se ofrezcan únicamente aquellos servicios de salud, se incurra en aquellas inversiones de capital, o que se adquieran aquellos equipos médicos altamente especializados, cuya necesidad y conveniencia pública haya sido previamente determinada por el Secretario. ”

Al amparo de la misma, el Departamento de Salud emitió el Reglamento Núm. 89 Para Regular el Proceso de Evaluación de Solicitudes Para el Otorgamiento de Certificados de Necesidad y Conveniencia, Reglamento Núm. 5704 de 20 de octubre de 1997. El Artículo VI, titulado Guías Generales Sobre Evaluación de Solicitudes dispone: 

“En el proceso evaluativo de las solicitudes para la concesión de un Certificado de Necesidad y Conveniencia, el Secretario de Salud tomará en cuenta, en la medida que sean de aplicabilidad al caso, los siguientes factores o criterios evaluativos generales; disponiéndose que en el referido proceso evaluativo, el Secretario mantendrá la discreción necesaria para sopesar y evaluar dichos criterios en aquella forma y manera que mejor facilite la implantación de la Ley Número 2 del 7 de noviembre de 1975, según enmendada, y la política pública del Departamento de Salud: (Enfasis suplido.)

1. La relación entre la transacción para la cual se solicita el certificado y el plan de desarrollo de servicios a largo plazo, si alguno, del solicitante.

2. La necesidad actual y proyectada que tiene la población a ser afectada por la transacción contemplada de los servicios que se proveerán mediante la misma.

3. La existencia de alternativas a la transacción para la cual se solicita el certificado o la posibilidad de proveer los servicios contemplados de manera más eficiente o menos costosa que la propuesta por el solicitante.

4. La relación entre el sistema de salud operante en el área y la transacción propuesta.

5. En el caso específico de solicitantes de Certificados de Necesidad y Conveniencia para el ofrecimiento de servicios de salud, el Secretario deberá considerar también los siguientes factores:

(a) La disponibilidad de recursos humanos y económicos para el rendimiento eficiente de esos servicios.

(b) El impacto que la forma de proveer los servicios tendrá sobre las necesidades de entrenamiento clínico que puedan tener los profesionales de salud del area en donde los servicios habrán de prestarse.

(c) El por ciento de la población del área a ser servida que tendrá acceso a los servicios propuestos. El Secretario deberá exigir que la solicitud indique el tiempo que el solicitante necesitará para hacer disponible el servicio o equipo objeto de la petición o realizar el gasto objeto de la transacción.

6. El nivel de competitividad y de eficiencia operacional de Iqs facilidades de salud existentes en el área de 
*578
servicios de la acción propuesta.

7. El nivel de concentración existente en el área de servicio de la acción propuesta y la medida en que un incremento en la oferta estimule la competencia, en cuyo caso se podría favorecer la acción propuesta. ”

Posteriormente, el 4 de diciembre de 1997, el Departamento emitió el memorando Circular 1997-1. El Art. II dispone:

“II- Guías para la Aplicación de los Criterios Generales del Reglamento 89

1- En el análisis de la necesidad actual y proyectada que tiene la población a ser afectada por la transacción contemplada de los servicios que se proveerán mediante la misma, se tomaran en consideración los siguientes factores:

a) el número total de facilidades de salud del mismo tipo de la propuesta en el área de servicio.

b) indicadores socio-económicos de utilización per capita de los servicios de salud propuestos en el area de servicio incluyendo cualquier tendencia estadística relativa al aumento o disminución de los mismos.

c) la población fija en el área de servicio.

d) las características socio-económicas de la población en el área de servicio, incluyendo ingreso percápita.

e) los patrones de incidencia de enfermedades o condiciones de la población en el área de servicio en relación a la acción propuesta.

2- En cuanto a la existencia de alternativas a la acción propuesta (Criterio 3 del Reglamento) se considerarán los siguientes factores:

a) número de facilidades que ofrezcan el mismo servicio al propuesto en el área de servicio de la propuesta.

b) extensión y tipo de servicio ofrecido por las facilidades existentes.

c) calidad profesional y complejidad de los servicios prestados por las facilidades existentes.

d) horario y disponibilidad de los servicios de las facilidades existentes.

e) capacidad de expansión de la oferta de servicios de las facilidades existentes.

3- En cuanto a la relación de la acción propuesta y el sistema de salud del área (Criterio 4), se tomarán en cuenta los siguientes factores:

a) si al área de la acción propuesta les han sido extendidos los beneficios de la Reforma de Salud mediante el Seguro de Salud adquirido por la Administración de Seguros de Salud.

b) la forma en que la acción propuesta complemente los servicios de salud existentes en la prestación de otros servicios de salud.

4- En cuanto al nivel de competitividad y la eficiencia operacional de las facilidades existentes en el area de servicio se tomarán en cuenta los siguientes factores:

*579
a) el precio cobrado por el servicio propuesto por las facilidades existentes, versus el precio proyectado por el proponente.

b) el costo operacional por unidad de prestación de servicios de salud de las facilidades existentes, versus el costo proyectado por el proponente.

5- En cuanto al nivel de concentración existente en el area de servicio (Criterio 7), se tomarán en cuenta los siguientes factores:

a) índice de concentración "Herfindahl-Hirschman Index" ("HHI").

b) análisis utilizando el HHI sobre el efecto en el nivel de concentración de la entrada de un nuevo proveedor de servicios en el área de la acción propuesta. ”

Recientemente, en Lab. Inst. Med. Ava. v. Lab. C. Borinquen, _ D.P.R. _ (1999), 99 J.T.S. 141, el Tribunal Supremo aclaró la naturaleza jurídica del certificado de necesidad y conveniencia, al igual que el estándar de revisión para las resoluciones emitidas por el Secretario de Salud respecto a los mismos, exponiendo como sigue:
“En decisiones previas de este Tribunal, hemos caracterizado la naturaleza jurídica del certificado de necesidad y conveniencia. Hemos resuelto que se trata de un mecanismo de planificación, mediante el cual el Secretario de Salud formula e implanta a la vez la política pública sobre los servicios de salud. Ruiz Hernández v. Mahiques, 120 D.P.R. 80, 89 (1987). "El Secretario, al otorgar o denegar un certificado de necesidad y conveniencia, no sólo concede o deniega un permiso para operar una facilidad de salud, sino que planifica el desarrollo de éstas en las distintas áreas regionales de salud". Id., a la pág. 88. "...el Secretario tiene facultad para reglamentar y adjudicar al mismo tiempo. La formulación de la política pública no se limita únicamente al mecanismo de reglamentación, sino que se extiende al de adjudicación". Id., a la pág. 86. Hemos, señalado, ademas, que la decisión de otorgar o denegar un certificado de necesidad y conveniencia surge de un proceso evaluativo institucional, que culmina con la decisión personal del Secretario. Hosp. San Pablo v. Hosp. Hnos. Meléndez, 123 D.P.R. 720, 732-733 (1989) Se trata de un proceso que requiere la evaluación de muchas circunstancias y factores complejos, y la ponderación de varios criterios diversos. Hosp. San Pablo v. Hosp. Hnos. Meléndez, supra; Ruiz Hernández v. Mahiques, supra, a la pág. 87. ”
De lo anterior, es evidente que la decisión final del Secretario apareja el uso de su discreción. Tal decisión no puede tomarse sin antes sopesar numerosos elementos y pasar juicio sobre distintas consideraciones, para entonces determinar qué es lo que más conviene al interés general y al bien común. Ruiz Hernández v. Mahiques, supra. Es por ello que el Art. VI del Reglamento Núm. 56, transcrito antes, en términos claros dispone que cuando una solicitud para un certificado de necesidad y conveniencia "no llene uno o más de los criterios aplicables, la solicitud podrá ser denegada ". Surge de modo palmario que en estos casos el Secretario tiene discreción para denegar el certificado; o por implicación, para concederlo, si ello es necesario y conveniente. Tiene discreción para obviar un criterio reglamentario, cuando ello sea procedente.
Este reconocimiento reglamentario de la discreción referida del Secretario merece nuestra deferencia por dos razones fundamentales. Por un lado, reiteradamente hemos afirmado la norma doctrinal de que la interpretación que una agencia le de a su ley orgánica amerita gran respeto y consideración judicial. Asoc. Médica de P.R. v. Cruz Azul, 118 D.P.R. 669, 678 (1987); Tormos & DACO v. F.R. Technology, 116 D.P.R. 153, 160 (1985); Quevedo Segarra v. J.A.C.L., 102 D.P.R. 87, 96 (1974). Por otro lado, una interpretación contextual de la Ley Núm. 2 referida, claramente revela, como intimamos en el párrafo anterior, que el legislador dejó en manos del Secretario la determinación de conceder o denegar los certificados requeridos, sujeto a unas guías y criterios que aparejan un ámbito de discreción.
Es cierto que la Ley Sobre Certificados de Necesidad y Conveniencia contiene disposiciones específicas y *580 rigurosas que el Secretario de Salud debe observar durante las vanas etapas del proceso de conceder o denegar los certificados requeridos. Pero ello sólo significa que su discreción está debidamente limitada. Las disposiciones aludidas persiguen demarcar precisamente el alcance de su discreción. No pretenden ser una camisa de fuerza para restringir innecesariamente la propia facultad que le delega la Ley Núm. 2 para expedir o denegar los certificados referidos. Como tantas veces sucede en el Estado moderno, por la complejidad del mandato que se le otorga al Secretano, se le delegan amplios poderes, con normas para delimitar su ejercicio, pero otorgándole a la vez discreción en el desarrollo y ejecución de la política pública. M & BS, Inc. v. Depto. de Agricultura, 118 D.P.R. 319 (1987); López v. Junta de Planificación, 80 D.P.R. 646 (1958).
III
El Informe de la Oficial Examinadora, el cual fue acogido íntegramente por la Secretaria de Salud, recomienda la denegatoria del CNC solicitado al concluir que el area de servicio esta bien servida por las farmacias existentes y que, de expedirse el CNC solicitado, estas ultimas se venan severamente afectadas, impactándose adversamente la ordenada prestación de esos servicios a los residentes en el área. Walgreens impugna la denegatoria del CNC, levantando un señalamiento de error de naturaleza esencialmente procesal (error 1-a); expresando su inconformidad sobre las conclusiones de hechos (errores 1-b al 1-e); y argumentando que la resolución es contraria a la política pública en tomo a la prestación de servicios de salud (error 2).
En el señalamiento de error 1-a, Walgreens argumenta que la denegatoria, en la resolución recurrida, de su solicitud de un CNC para añadir un recetario a la tienda que opera en el Centro Comercial Reparto Metropolitano se fundamenta en que dicho CNC le había sido denegado en dos ocasiones anteriores; o sea, en los procedimientos 89-01-306 y A-95-01071, culminando éstos en las resoluciones denegatorias de 1 de septiembre de 1993 y 21 de octubre de 1997.
No tiene razón la recurrente. La resolución recurrida no adjudica la solicitud fundamentándose en que las resoluciones anteriores constituyen cosa juzgada. Las referencias a las anteriores resoluciones no constituyen parte esencial de la ratio decidendi de la resolución recurrida. Si se omiten dichas referencias, lo restante constituye una denegatoria del CNC en consideración a los méritos de la solicitud. La mención de las anteriores resoluciones es redundante desde la perspectiva del fundamento para la denegación del CNC.
El incluir estas referencias en la resolución recurrida, llena dos funciones. Una, presenta un cuadro procesal más completo, del cual se desprende la aprobación de un nuevo reglamento, el Reglamento Núm. 89, supra. La existencia de este nuevo reglamento provee la justificación procesal para que el Departamento vuelva a considerar la solicitud de CNC Núm. A-95-01-071, a pesar de que esta solicitud había sido adjudicada previamente por medio de la resolución de 21 de octubre de 1997.
Como segunda función, la mención de las resoluciones previas sirve para indicar que los hechos esenciales no han variado significativamente desde la última resolución. En particular, indica que no ha cambiado la determinación de hecho al efecto de que el establecimiento del recetario en la localización propuesta conllevaría efectos adversos sustanciales para las farmacias existentes e impactana desfavorablemente la ordenada prestación de servicios de farmacia en el área. A pesar de que este hecho no ha cambiado, resta por considerarse si bajo el nuevo reglamento todavía procede el mismo remedio jurídico; o sea, la denegatoria del CNC solicitado. Este aspecto es uno para ser considerado separadamente, por lo que lo discutiremos más adelante al considerar el señalamiento de error Núm. 2.
Concluimos que la referencia a las resoluciones de 1 de septiembre de 1993 y 21 de octubre de 1997 no constituye error de derecho, ya que en la resolución recurrida no se aduce que procede la denegatoria bajo la doctrina de cosa juzgada, o la doctrina relacionada de impedimento colateral por sentencia. El reseñar que no ha variado la determinación de hecho, de que el otorgar el CNC tendría un resultado adverso en las otras farmacias, por sí no justifica la denegatoria del CNC, pues podría ser diferente el resultado bajo el nuevo reglamento. Ahora bien, ello tampoco implica que es inválido lo resuelto en la resolución recurrida. Para *581 determinar si debemos dar deferencia a lo resuelto por el Departamento, es necesario considerar: (1) si las determinaciones de hechos están sustentadas por prueba sustancial disponible en el expediente administrativo, lo cual consideraremos al discutir los señalamientos de errores 1-b al 1-e; y (2) si a la luz de dichas determinaciones, bajo la discreción concedida por la Ley Núm. 2, supra, y el Reglamento Núm. 89, supra, la Secretaria de Salud podía denegar el CNC solicitado, lo cual discutiremos al considerar el señalamiento de error Núm. 2.
En los señalamientos de errores Núms. 1-b, 1-c y 1-e, Walgreens aduce que incidió la Secretaria de Salud, ya que la concesión del CNC no causaría detrimento a las farmacias existentes ni a la población servida por las mismas. Además, en el señalamiento de error 1-d aduce que, al otorgársele a Walgreens el CNC para operar el Walgreens RxExpreso en la Avenida Piñeiro #1198, ya se adjudicó favorablemente la necesidad y conveniencia de un establecimiento operado por Walgreens en el área de servicio, lo cual es inconsistente con la denegatoria en la resolución recurrida. El señalamiento 1-d equivale a argumentar que lo solicitado por Walgreens es una mera relocalización que no debe ser juzgada bajo los mismos criterios que la solicitud de un CNC-*para el establecimiento de una nueva farmacia.
Este grupo de señalamientos están íntimamente relacionados entre sí, por lo que los consideraremos en conjunto. Estos, en esencia, impugnan las determinaciones de hechos de la resolución recurrida.
Durante las vistas celebradas los días 15 y 16 de junio de 1999, las partes presentaron varias categorías de evidencia pertinentes a la solicitud de CNC. En primer lugar, presentaron cuarenta y seis (46) estipulaciones de hechos, previamente incorporadas en el Acta Enmendada de Conferencia con Antelación a Vista, de las cuales citamos anteriormente las primeras veintidós (22). Las estipulaciones restantes incluyen un gran número de datos específicos sobre el "área de sencidos", cuyo término, según el Reglamento, se refiere al área contenida en un círculo, con radio de una milla, centralizado en la localización de la farmacia propuesta. Dichas estipulaciones incluyen los servicios ofrecidos al presente por las diecisiete (17) farmacias preexistentes y los servicios que ofrecería Walgreens en la localización propuesta, el Centro Comercial Jardines Metropolitanos. Entre los hechos estipulados están el horario de operaciones, planes médicos aceptados, personal profesional y personal auxiliar que opera las farmacias y los servicios provistos a la comunidad y a los clientes. Aunque existe sustancial similitud entre los ofrecimientos de las diecisiete (17) farmacias preexistentes y los propuestos por Walgreens, también existen algunas diferencias. A manera de ejemplo, las farmacias opositoras y las otras preexistentes proveen los siguientes servicios que no serían provistos por Walgreens: entrega a domicilio, la provisión de crédito a los clientes y una relación personal de farmacéutico a cliente que le permite al farmacéutico ser un consejero o asesor a sus clientes en el área de medicamentos. Por su parte, Walgreens provee un sistema computarizado, y de telecomunicaciones entre su cadena de farmacias, más avanzado que el ofrecido por las otras farmacias.
liemos examinado cuidadosamente la totalidad de dichas estipulaciones y concluimos que se presentó amplia evidencia para respaldar la aseveración de que el área de servicios está bien servida por las diecisiete (17) farmacias localizadas en ésta.
En cuanto a prueba documental, la proponente sometió en evidencia un número sustancial de documentos, de los cuales los principales son el informe presentado por su perito economista, Dr. Jorge Freyre, y el grupo de tablas preparadas por éste. Las tablas presentan el cómputo del Herfindahl-Hirschman Index, en adelante HHI o índice Herfindahl, para un grupo de escenarios propuestos por el Dr. Freyre. Debido a su importancia, Walgreens nos incluyó, como parte del presente recurso, el informe de su perito y las tablas del HHI calculadas por su éste, en las págs. 5 a 43 y 407 a 419 del apéndice del recurso.
Las opositoras también presentaron evidencia documental, incluyendo: (1) el informe en el cual el perito economista de las opositoras, Sr. Feliciano, evaluaba y criticaba el informe preparado por el Dr. Freyre; y (2) un grupo de tablas del cómputo del índice Herfindahl, bajo varios escenarios propuestos por ej Sr. Feliciano, los *582 cuales, según éste, presentaban una representación más correcta y realista que la presentada por el Dr. Freyre de la situación futura en el área de servicios. Estos dos documentos son de crítica importancia para evaluar los señalamientos de errores 1-b al 1-e, ya que la Oficial Examinadora, en esencia, aceptó como más correcta la versión presentada por el Sr. Feliciano.
La recurrente, Walgreens, no nos incluyó en el apéndice del recurso de revisión bajo consideración el informe del Sr. Feliciano, ni las tablas del HHI presentadas por éste. Al omitirlas, teniendo en cuenta su importancia, Walgreens incurrió en una violación significativa de las Reglas 59E (1) (e) y 59 E (1) (f) del Reglamento del Tribunal de Circuito de Apelaciones, 4 L.P.R.A. Ap. XXII-A, R. 95 E (1) (e) y R. 95 E (1) (f). [4] Dicha omisión del informe y tablas presentados por la parte opositora, a pesar de haber incluido los presentados por la parte recurrente, merece nuestra desautorización, y podría constituir fundamento para desestimar el recurso por incumplimiento craso con nuestro Reglamento. El Tribunal Supremo ha sido enfático al señalar que en la práctica apelativa las disposiciones reglamentarias deben observarse rigurosamente y no se justifica en ningún modo dejar al arbitrio de los abogados el decidir que disposiciones deben acatarse y cuando. Arriaga v. F.S.E., _ D.P.R. _ (1998), 98 J.T.S. 28, a las págs. 687-688; Muñiz Alcaraz v. Muñoz López, 139 D P R _ (1995), 95 J.T.S. 141, a la pág. 193. Véase, además, Córdova Ramos v. Larín Herrera, 2000 J.T.S. 92.
La evidencia testifical presentada por la proponente consistió del testimonio de la Supervisory de la Farmacias Walgreens para el distrito este de Puerto Rico. Para economizar tiempo durante la vista, su testimonio directo fue presentado por medio de su declaración jurada, la cual fue admitida en evidencia, luego de lo cual la parte opositora la contrainterrogó. Un segundo gerente de Walgreens testificó respecto a la imposibilidad de continuar operaciones en el recetario de la calle Piñeiro #1198, ya que Walgreens optó por no comprar el edificio en el que está localizada su farmacia y el nuevo adquirente del mismo va a demolerlo. El tercer testigo fue un especialista en mercadeo, quien explicó porqué la localización del Centro Comercial Reparto Metropolitano era preferible a la Calle Piñeiro #1198. Finalmente, presentó a su perito economista, Dr. Freyre, cuyo testimonio elaboraremos más adelante.
Por la parte opuesta al CNC estaban disponibles para testificar los dueños de las cinco farmacias opositoras. Para economía procesal, los abogados de las dos parte acordaron y presentaron al oficial examinador una estipulación sobre lo que los dueños de las farmacias opositoras testificarían, quedando dichos testigos a la disposición de Walgreens para ser contrainterrogados sobre cualquier extremo pertinente a la solicitud de CNC. El día de la vista, Walgreens optó por no contrainterrogarlos, a pesar de que los testigos de la parte opositora se encontraban presentes en el salón de vistas. El testimonio de estos, según admitido en parte, es el siguiente. 
“Ni área de servicio está más que bien servida por las farmacias existentes ... [y] está sumamente saturada de farmacias. El local propuesto está frente por frente a la Farmacia Gelpí. La presencia de Walgreens en el Centro Comercial Reparto Metropolitano trastocaría la prestación de servicios farmacéuticos del área, arriesgando el que algunas de las opositoras'-se vean forzadas a cerrar operaciones, ... indicarán que en el local de la Avenida Piñeiro del cual se quiere relocalizar, la proponente ya ha causado efectos adversos, habiendo al menos influenciado en el cierre de tres farmacias cercanas a ese local, ....

Testificarán, además, que durante el período de quince (15) meses que la proponente operó un recetario en el Centro entre el 1991 y el 1992, sus respectivas farmacias sufrieron una sustancial merma en ventas de recetas despachadas, lo que ocasionaba una merma en las ventas de otros productos en la farmacia, afectándose adversamente las operaciones de su farmacia durante ese periodo de (15) quince meses. Testificarán que, como consecuencia de la merma en ventas, tuvieron que cesantear empleados, expandir horarios, incurrir en gastos adicionales como seguridad, promoción y expansion del area de ventas. Indicaran que, inclusive, la administración de la farmacia tuvo que ejercer Junciones adicionales para atemperar el vacío de los empleados que tuvo que cesantear. ”

*583 Por la parte opositora testificó, además, su perito economista, Sr. Feliciano, cuyo testimonio discutiremos más adelante.
La parte central de la vista administrativa la constituyo el testimonio de los dos peritos economistas, el cual versó principalmente sobre el índice Herfindahl de concentración en el mercado. 
El índice Herfindahl es una medida, para una "área de servicios", del grado de concentración de la oferta de cierto tipo de producto o servicio. Para calcularlo, se comienza determinando, con relación al área de servicios y los productos vendidos, qué fracción del mercado ("market share") posee cada suplidor. Por ejemplo, consideremos que existen dos suplidores, uno de los cuales vende seis mil (6,000) unidades y el otro tres mil (3,000), para un total de ventas en el mercado de nueve mil (9,000) unidades. En este caso, el primero tiene una fracción del mercado de dos tercios, o sea, 6,000 dividido por 9,000, y el otro tiene una fracción de un tercio, o sea, 3,000 dividido por 9,000. Para calcular el índice Herfindahl, se obtiene la suma, para todos los competidores, del cuadrado de la fracción del mercado. En el ejemplo anterior, dicha suma sería el cuadrado de dos tercios, más el cuadrado de un tercio; o sea, cuatro novenos, más un noveno, lo cual nos da una suma de cinco novenos. Para facilitar la presentación, la suma así obtenida es multiplicada por diez mil (10,000), obteniéndose así el valor del índice Herfindahl. En el ejemplo mencionado, el valor del índice Herfindahl sería cinco mil quinientos cincuenta cinco (5,555); o sea, cinco novenos multiplicado por diez mil. 
La mayor parte del testimonio de los dos peritos se refirió al cómputo del índice Herfindahl. Ambos peritos aceptaron, como una descripción esencialmente correcta de la situación preexistente en el año 1996, la tabla incluida al final del informe del Dr. Freyre, pág. 43 del apéndice del recurso. Dicha tabla arroja un valor de 958 para el índice Herfindahl.
Durante interrogatorio directo y contrainterrogatorio, el Dr. Freyre se refirió a las tablas incluidas en el apéndice M del presente recurso, págs. 407 a 419 del mismo. Según la tabla 1, pág. 407, al momento de la vista, o sea, mediados del año 1999, el HHI estaba en 1,133. Luego, en la tabla 2, pág. 409 del apéndice, utilizando su estimado de que de concederse el CNC Walgreens despacharía 94,170 recetas anualmente en su local del Centro Comercial Jardines Metropolitanos, el Dr. Freyre obtiene un valor del HHI de 1,283. En el contrainterrogatorio, el Dr. Freyre hizo referencia a la tabla 5, pág. 417 del apéndice, en la cual se utiliza como estimado de las ventas de Walgreens la figura de 157,500 recetas anuales, obteniéndose un valor del HHI de 1,652. Cabe señalar que este estimado fue el sugerido por el Sr. Feliciano.
Durante interrogatorio directo, el Sr. Feliciano, perito de la parte opositora, indicó que él tenía tres críticas fundamentales al análisis presentado por el Dr. Freyre. La primera crítica es que es irrealista proyectar que el volumen de recetas despachadas por Walgreens en el Centro Comercial Jardines Metropolitanos, sería el mismo o menor que en el año 1992, a pesar del aumento significativo en el despacho de recetas que ha ocurrido desde el 1992. En los últimos seis meses de su operación en el Centro Comercial Jardines Metropolitanos, durante el ano 1992, Walgreens despachó recetas equivalentes a 127,020 anuales. Al ajustarlo al aumento en el volumen de recetas en el área de servicio, se obtiene un nivel de 157,500 recetas anuales.
La segunda crítica presentada por el Sr. Feliciano es que el análisis del Dr. Freyre incluye a la Farmacia Siempre Abierta, a pesar de que la misma está localizada fuera del área de servicio y que, además, incluye a la Farmacia del Hospital del Maestro, a pesar de que ésta es una farmacia de hospital; o sea, no es del tipo de farmacia dedicada a vender al público, como lo son las otras. Usualmente, las ventas de una farmacia de hospital se hacen a un "mercado cautivo", compuesto de los pacientes que visitan la sala de emergencia, y los pacientes previamente recluidos en el hospital cuando los mismos son dados de alta. El Sr. Feliciano considera que ambas farmacias deben de eliminarse del cálculo del HHI por no llenar los requisitos de estar localizadas en el area de servicios o por no servir el mismo tipo de mercado que las otras farmacias del área de servicio.
Finalmente, la tercera crítica presentada por el Sr. Feliciano es que es irrealista la asunción presentada por el *584 Dr. Freyre al efecto de que al ubicarse Walgreens en el Centro Comercial no se afectarán el número de recetas despachadas por las otras farmacias en el área de servicio, a pesar de que Walgreens despacharía un volumen mucho mayor que el que despacha en su localización en la Avenida Piñeiro #1198. El Sr. Feliciano estimó que el impacto sería una reducción de un once por ciento (11%) en el volumen de recetas despachadas por las otras farmacias.
Al incorporar el efecto de estas tres críticas a las proyecciones del Dr. Freyre, el Sr. Feliciano obtuvo, en su tabla 5-A, un índice Herfindahl de 2,136. Aunque tal índice representa un aumento muy significativo con relación al valor de 958 existente al presente, éste no es irrazonable, considerando que cuando Walgreens operó un recetario en el Centro Comercial Jardines Metropolitanos en el año 1992, el índice Herfindahl era de 3,700 (pág. 366 del apéndice). En resumen, cuando se hacen las correcciones necesarias a las tablas presentadas por el Dr. Freyre, el índice Herfindahl sube de su valor presente de 958 a 2,136, un aumento muy significativo que indica un mercado mucho menos competitivo que al presente, con la pérdida que eso representa en la calidad de los servicios recibidos por los consumidores.
La observación respecto al cambio en el nivel de concentración, demuestra, ademas, que el señalamiento de error 1-d no procede. El mero hecho de que se pueda categorizar la solicitud del CNC como una relocalización dentro del área de servicio", no implica que no es necesario evaluar el impacto del cambio propuesto. Algunas relocalizaciones no tienen impacto adverso, pero otras, como la aquí propuesta, sí lo tienen.
Concluimos que no procede que alteremos las determinaciones de hechos de la resolución recurrida. Estas, no sólo están respaldadas por evidencia sustancial en el expediente administrativo, sino que concurrimos con las mismas, ya que las mismas representan la interpretación más racional de la evidencia. No se cometieron los señalamientos de error 1-b, 1-c, 1-d y 1-e.
En el señalamiento de error número 2, Walgreens presenta su versión de lo que debe ser la política pública en tomo a la prestación de servicios de farmacias en Puerto Rico. Fundamentándose en ello, concluye que otorgarle el CNC solicitado está acorde con dicha formulación, por lo que reclama que incidió el Departamento al denegárselo.
En primer lugar, debemos señalar que ni Walgreens, ni los tribunales de justicia, son los designados para formular política pública en esta área. El Secretario de Salud es quien ha sido encargado de formular la política pública sobre las facilidades de salud, tales como hospitales, laboratorios clínicos, farmacias y otros.

"La planificación ordenada de las facilidades y servicios de salud es indispensable para atender adecuadamente las necesidades de salud de [la] población, controlar los costos de los servicios de salud y velar porque éstos se presten en aquellos núcleos poblacionales donde sean necesarios. Exposición de motivos de la Ley Núm. 16, supra. Como herramienta para permitirle al Secretario lograr dichos objetivos, el legislador le otorgó el poder de controlar el establecimiento de las facilidades y servicios de salud, al requerir para ello un certificado de necesidad y conveniencia expedido por el Secretario de Salud. ”

En Hernández v. Mahíques, supra, a las págs. 87 a 89, el Tribunal Supremo indicó que el otorgamiento del CNC es una parte integral de la formulación de política publica por el Secretario de Salud. Elaboro como sigue.

“Contrario a lo que ocurre con otros organismos administrativos conjunciones cuasi judiciales, que al emitir sus decisiones sólo afectan a una o varias partes, el Departamento de Salud, en la instrumentación de la Ley sobre Certificados de Necesidad y Conveniencia, tiene la encomienda de planificar los servicios de salud y trazar la política pública al respecto. Hospital Law Manual, Aspen System Corporation, Vol. I-A, Health Planning, Secs. 1-6; Chayet & Sonnenreich, Certificate of Need: An Expanding Regulatory Concept, 1978, Publicaciones MIPI.

*585 El Secretario, al otorgar o denegar un certificado de necesidad y conveniencia, no sólo concede o deniega un permiso para operar una facilidad de salud, sino que planifica el desarrollo de éstas en las distintas áreas regionales de salud. En este sentido, afecta no sólo al peticionario, sino a la región de salud de que se trate. Su dictamen es una regla o norma con efectos regionales y generales. Por ello, la Ley sobre Certificados de Necesidad y Conveniencia es tan rigurosa al exigir la más amplia y efectiva notificación de la presentación de una solicitud, no sólo a los posibles afectados, sino al público en general. La Ley sobre Certificados de Necesidad y Conveniencia propicia una amplia y adecuada participación ciudadana, precisamente porque la decisión tendrá el impacto de una regla o norma. ” (Enfasis suplido.)
dec}dirl° asC el Secretario formula política pública mediante un mecanismo de planificación de la salud, de tipo adjudicativo. Dicha formulación e implantación de política pública está integrada legal y funcionalmente. Como cuestión de realidad, ambas funciones no son separables. ” (Enfasis suplido.)
Además, según previamente citamos, en Lab. Inst. Med. Ava. v. Lab. C. Borinquen, supra, el Tribunal Supremo ha enfatizado que la decisión en cuanto a un CNC requiere "la evaluación de muchas circunstancias y factores complejos y la ponderación de varios criterios diversos". Por ello, "la decisión del Secretario apareja el uso de su discreción". Dicho uso de discreción merece la deferencia de los tribunales por dos razones: (1) en atención a la doctrina de que la interpretación que una agencia le de a su ley orgánica, amerita gran respeto y consideración judicial, y (2) porque de un análisis de la Ley Núm. 2, supra, se desprende que "el legislador dejó en manos del Secretario la determinación de conceder o denegar los certificados requeridos, sujeto a unas guias y criterios que aparejan un ámbito de discreción."
, Ea res°lución que adjudica la solicitud de un CNC, conlleva la formulación de la política pública para el area geográfica concernida, a la luz de los otros factores envueltos en el caso particular bajo consideración. La rnnción revisora de los tribunales es una limitada cuando la controversia en revisión concierne la formulación de política pública por la agencia, ya sea ésta ejercida por medio de promulgar reglamentos formales, o a través de la consideración de casos particulares, como ocurre al considerarse un CNC. El ámbito de dicha revisión se limita a evaluar los siguientes factores: (1) si la actuación administrativa está autorizada por ley; (2) si se delegó poder de formulación de política pública o reglamentación; (3) si la reglamentación está dentro de los poderes delegados en su ley orgánica; (4) si al aprobarse el reglamento o formularse la política pública, se cumplió con las normas procesales de la ley orgánica y de las leyes especiales; y 5) si ésta es arbitraria o caprichosa. Aulet Lebrón v. Depto. Servicios Sociales, 129 D.P.R. 1 (1991); Luán Investment Corp. v. Román, 125 D.P.R. 533 (1990); Marketing & Brokerage, Inc. v. Dept. Agricultura, 118 D.P.R. 319, 326 (1987).
En su discusión del señalamiento de error Núm. 2, la recurrente no hace referencia a ninguno de los primeros cuatro factores, por lo que su reclamo es, en esencia, que la política pública expuesta en la resolución recurrida es arbitraria o caprichosa. Veamos si dicho señalamiento de error es válido.
_ Antes de entrar a considerar los factores particulares envueltos en la resolución recurrida, es necesario señalar que el legislador expresamente rechazó una competencia irrestricta entre posible suplidores de servicios de farmacia; o sea, lo que resultaría si no fuese requerido un CNC. En lugar de ello, el legislador indicó que el Secretario de Salud debía intervenir para lograr "una planificación ordenada de las facilidades y servicios de salud", para poder "atender adecuadamente las necesidades de salud de [la] población, controlar los costos de los servicios de salud y velar porque éstos se presten en aquellos núcleos poblacionales donde sean necesarios."
atención a dichos objetivos, el Secretario promulgó el Reglamento Núm. 89, supra, en particular el Art. VI sobre Guías Generales Sobre Evaluación de Solicitudes, supra, el cual fue complementado por las Guías para la Aplicación de los Criterios Generales del Reglamento 89 contenidas en el Memorando, Circular 1997-1. El esquema de reglamentación adquiere su estructura final al considerarse lo expuesto, y las pormas implícitas, *586 en las resoluciones que adjudican las solicitudes CNC.
La resolución recurrida resolvió que en un área de servicio urbana densamente poblada con una concentración de una farmacia por cada 2,274 habitantes, no procedía otorgar un CNC a una farmacia con un prognóstico de ventas alto, ya que: (1) el área de servicio está bien servida por las farmacias existentes; (2) las farmacias preexistentes se verían severamente afectadas, a su vez afectando la ordenada prestación de servicios a los residentes del área; y (3) el establecimiento de la misma conllevaría un aumento no trivial en el índice Herfindahl.
El primero de los tres criterios, de que no se favorece el otorgamiento de un CNC cuando el área está bien servida por las farmacias existentes, particularmente cuando hay una densidad de una farmacia por cada 2,274 habitantes en el área de servicio, es razonable. De esa forma, el Departamento estimula el establecimiento de farmacias en áreas con poca densidad de farmacias, o donde el servicio provisto por las allí operantes sea deficiente en algún aspecto considerado importante por el Departamento.
El segundo y el tercer criterio para denegar el CNC, a saber, es que se verían seriamente afectadas las farmacias preexistentes y que el otorgarlo conllevaría un incremento no trivial en el índice Herfindahl, son funcionalmente equivalentes, por lo que los consideraremos en conjunto. Ambos están directamente relacionados con las determinaciones de hechos formuladas en la resolución recurrida en cuanto a que de otorgarse lo solicitado se establecería una farmacia con un alto volumen de despacho de recetas, acaparando de esa forma parte del mercado suplido por las farmacias preexistentes.
El utilizar tales criterios, no constituye una reglamentación arbitraria o irrazonable, ya que los mismos están acorde con el propósito de la legislación. Ello se desprende de la definición de un certificado de necesidad y conveniencia contenida en la Ley Núm. 2, supra, 24 L.P.R.A. sec. 334 (e), la cual es como sigue.

“§ 334. Definiciones.

Para los propósitos de las sees. 334 a 334j de este título, las siguientes palabras tendrán los significados, a saber:

(a)...

(e) Certificado de necesidad y conveniencia. Documento emitido por el Secretario de Salud autorizando a una persona a llevar a cabo cualquiera de las actividades cubiertas por las sees. 334 a 334j de este titulo, certificando que la misma es necesaria para la población que va a servir y que no afectara indebidamente los servicios existentes, contribuyendo así al desarrollo ordenado y adecuado de los servicios de salud en Puerto Rico.” (Enfasis suplido.)
A las agencias a las cuales se le ha delegado autoridad para emitir reglamentación socio-economica, se les reconoce vasta discreción, siempre que la reglamentación este razonablemente relacionada con el proposito de la legislación Dichas reglas no se considerarán arbitrarias, ni puede concebirse una situación que las justifique. Defendini Collazo et al v. E.L.A., Cotto, 134 D.P.R. _ (1993), 93 J.T.S. 119; Coca-Cola Bottling Co. v. Srio. de Hacienda, 112 D.P.R. 707, 710 (1982).
En el caso de autos, es evidente que la reglamentación contenida en el segundo y tercer criterio es altamente congruente con uno de los propósitos ínsitos en la definición misma de un CNC; a saber, que no se afecten indebidamente los servicios existentes. Concluimos que no se cometió el error Núm. 2 señalado por la recurrente.
*587 IV
Por las consideraciones antes citadas, se deniega la expedición del auto de revisión.
Así lo pronunció y manda el Tribunal y lo certifica la Subsecretaría General. El Juez Ortiz Carrion disiente mediante opinión escrita.
Gladys E. Ortega Ramírez
Subsecretaría General
ESCOLIOS 2001DTA 8
1. La exposición de motivos citada proviene de la Ley Nüm. 16 de 19 de septiembre de 1983, la cual enmendó la Ley Núm.' 2 de 7 de noviembre de 1975.
2. El texto de los primeros cinco (5) factores a considerarse es el mismo usado en 24 L.P.R.A. 334b.
3. Al usar la frase "resolución recurrida", nos referimos, según se desprende del contexto, al informe de h Oficial Examinadora, o a la Resolución de la Secretaria de Salud que denegó el CNC solicitado.
4. Las Reglas 59 E (1) (e) y 59 E (1) (f) disponen:

“Regla 59. Contenido de solicitud de revisión. (E) Apéndice.

(1) La solicitud incluirá un apéndice que contendrá una copia literal de:

(a)...

(e) Toda resolución u orden, y toda moción o escrito de cualquiera dé las partes que forme parte del expedienté original administrativo, en los cuales se discuta expresamente cualquier asunto planteado en la solicitud de revisión, o que sean relevantes a ésta.

JP Cualquier otro documento que forme parte del expediente original en la Agencia y que pueda ser útil al Tribunal de Circuito de Apelaciones en la resolución de la controversia(Enfasis suplido.)
5. Para la totalidad del testimonio de las farmacias opositoras que fue estipulado, véanse las págs. 22 a 25 del Acta Enmendada de Conferencia con Antelación a Vista, pags. 66 a 69 del apéndice del recurso.
6. Según se desprende de la discusión que sigue, un valor alto del índice Herfindahl significa poca competencia; o sea, un mercado mayormente servido por una, o pocas, farmacias dominantes. Al contrario, un índice bajo refleja uft alto nivel de competencia; o sea, un mercado servido por muchas farmacias pequeñas, ninguna de las cuales es un factor dominante en el área de servicio.
7. Siguiendo la misma metodología, si existen diez suplidores de igual tamaño, o sea, cada uno con una fracción del mercado de un décimo, el índice Herfindahl sería de 1,000.
8. En el círculo con radio de una milla, centralizado en la localización propuesta, residen 38,665 habitantes.
9. De la discusión en la resolución y la evidencia ofrecida, el volumen prognosticado estaría entre 127,200 recetas anuales, al nivel que vendió los últimos seis meses del año 1992 y 157,500 recetas anuales, el nivel anterior ajustado por el incremento general de ventas.